SKC

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juan Daniel Ochoa, | No. CV 17-3270-PHX-DGC (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Juan Daniel Ochoa, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman in Florence, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Arizona Department of Corrections (ADC) Director Charles L. Ryan, Subodh Shroff, M.D., Corizon Health, Inc. ("Corizon"), and Corizon's HCV Treatment Review Committee move for summary judgment. (Doc. 47.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 51), and he opposes the Motion. (Doc. 57.) The Court will grant the Motion for Summary Judgment.

**I.     Background**

On screening of Plaintiff's two-count Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment, Americans with Disabilities Act (ADA), and Rehabilitation Act (RA) claims based on Defendants' alleged failure to treat his Hepatitis C ("Hep C" or "HCV") and their establishment of an "HCV protocol," which

Plaintiff alleges is designed to delay HCV treatment for cost-savings and administrative convenience. (Doc. 6.) The Court directed Defendants to answer these claims. (*Id.*)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). . . . .

**III. Facts**

    **A. HCV Treatment within ADC**

According to a Gilead Sciences report, incarcerated individuals are thirteen times more likely to have detectable levels of HCV in their blood than those in the general population. (Doc. 48 (Defs. Statement of Facts) ¶ 14, Ex. N.)[1] These elevated rates present challenges to prisons due to budgetary constraints and the high cost of HCV treatment. (*Id.*) As a result, the Federal Bureau of Prisons (BOP) developed a Clinical Guidance Manual for the Evaluation and Management of Chronic Hepatitis C (HCV) Infection (hereinafter, the "BOP Manual"), which contains a comprehensive framework for prioritizing prisoners for HCV treatment so that those with the greatest need are treated first. (*Id.* ¶ 15, Ex. O.) ADC and Corizon have adopted the BOP Manual. (*Id.*)

According to the BOP Manual, progression from chronic HCV infection to fibrosis and eventually cirrhosis may take years in some patients, decades in others, or may not occur at all. (*Id.* ¶ 16.) Most complications from HCV infection occur in people who develop cirrhosis. Therefore, assessing for cirrhosis is important when prioritizing patients for treatment. (*Id.* ¶ 18.) The BOP's preferred method for non-invasive assessment of fibrosis and cirrhosis is the APRI score, which is calculated using the results of two blood tests that measure the aspartate aminotransferase (ATP) and the platelet count. (*Id.* ¶¶ 19−20.)

The BOP Manual establishes priority levels for HCV treatment, according to which prisoners with "advanced hepatic fibrosis," liver transplant recipients, those with certain comorbid conditions, immunosuppressed patients, or those who already started treatment prior to incarceration are considered the highest priority (Priority Level One) for treatment.

---

[1] Based on information publicly available online, Gilead Sciences is a biopharmaceutical company that produces treatments for HIV, liver diseases, cancer, and inflammatory and respiratory diseases. *See* "About Gilead," *Year in Review 2018*, p. 100, *available at* https://www.gilead.com/-/media/files/pdfs/yir-2018-pdfs/year-in-review-2018_desktop.pdf?d=0502&la=en&hash=7375E850483FE0FB3BDA351D70AAA4FF (last visited July 19, 2019).

(*Id.* ¶¶ 22, 24, Ex. O at 8.) Advanced hepatic fibrosis is indicated by an APRI score greater than 2.0, "Metavir or Batts/Ludwig" stage 3 or 4 on a liver biopsy, or known or suspected cirrhosis. (*Id.*) The intermediate priority for treatment (Priority Level Two) includes patients who have an APRI score greater than 1.0 or "stage 2 fibrosis" on a liver biopsy, and those with certain comorbid conditions including liver disease, diabetes, and chronic kidney disease. (*Id.* ¶ 25.) The lowest priority for treatment (Priority Level Three) includes patients with an APRI score less than 1.0 or those who have stage 0−1 fibrosis on a liver biopsy. (*Id.* ¶ 26.) Because APRI scores are used to predict cirrhosis, liver biopsies are no longer required. (*Id.* ¶ 27, Ex. O at 6.)

In addition to the BOP Manual, Corizon follows the ADC "Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C (2017)" ("the Guidelines"). (*Id.* ¶ 30.) The Guidelines estimate that 23 per cent of ADC prisoners are infected with HCV. (*Id.*) The Guidelines incorporate the high, intermediate, and low Priority Levels from the BOP Manual. (*Id.* ¶ 31.) The Guidelines also provide that prisoners with APRI scores of 0.7 or higher or with advanced fibrosis will be prioritized for HCV treatment. (*Id.* ¶ 32, Ex. P at 8.)

Corizon's Hepatitis C Committee bases its decision on whether to treat prisoners with HCV on additional factors, including the absence of risky behavior as evidenced by no disciplinary tickets for drug possession or tattoos for one year. (*Id.* ¶ 34.)[2]

---

[2] In his Separate Statement of Facts, Plaintiff provides several paragraphs containing lengthy summaries of information about HCV and the history of HCV treatment, including the development of direct-acting antiviral (DAA) medications, which he cites as coming from "www.hcvguidelines.org." (Doc. 62 ¶¶ 41−54.) Plaintiff has not, however, set forth specific, relevant facts to this lawsuit in separate paragraphs as required under Local Rule 56.1(b). Nor has he attached a copy of the cited material or cited to specific page numbers in support of specific asserted facts. The Court was able to locate portions of Plaintiff's intended evidence at https://www. hcvguidelines.org/unique-populations/correctional (last visited June 19, 2019); however, because the Court was not able readily to identify specific controverting or additional facts in Plaintiff's lengthy summaries or find support for specific factual propositions, it has not included this material. General summaries and citations to lengthy documents, without specific page numbers, are insufficient to create a question of fact at summary judgment. *See Southern Cal. Gas Co. v. City of Santa Ana*,

### B. Plaintiff's HCV Care

On March 11, 2015, Plaintiff was seen by Dr. Bertram for a chronic care appointment. (Doc. 67 (Defs. Supplemental Statement of Facts) ¶ 1.) Dr. Bertram noted that Plaintiff had been diagnosed with HCV in 2004 or 2005. (Doc. 67 at 10.) He also noted that he was unaware of how Plaintiff had acquired HCV, but that Plaintiff had tattoos. (*Id.*) Plaintiff reported no active symptoms, and Dr. Bertram noted that Plaintiff's March 2014 labs were normal, and ordered new labs. (*Id.*) Dr. Bertram also noted no indications of liver disease and planned to monitor Plaintiff's liver function and follow up in six months. (*Id.* at 13−15.)

On May 13, 2015, Plaintiff had labs taken, and his APRI score was 0.40. (*Id.* ¶ 2; Doc. 67 at 20; Doc. 68, Ex. Y (Hutchinson Decl.) ¶ 5(e).) On May 3, 2016, Plaintiff had labs taken, and his APRI score was 0.40. (*Id.* ¶ 2; Doc. 67 at 27; Doc. 68, Hutchinson Decl. ¶ 5(f).) On May 31, 2016, Plaintiff saw Defendant Dr. Shroff for a chronic care appointment for his HCV, and presented no symptoms. (Doc. 67 at 32.) Dr. Shroff noted that Plaintiff's HCV was stable, ordered a diagnostic panel prior to the next chronic care visit, and made a plan to monitor liver functions and follow up in 6 months. (*Id.* at 36−38.) According to Plaintiff, Dr. Shroff told Plaintiff that starting DAA treatment for his HCV would do more harm than good. (Doc. 62 ¶ 57; Doc. 62, Ex. A (Pl. Decl.) ¶ 13.)

On November 8, 2016, Plaintiff filed a grievance alleging he had not been receiving proper laboratory tests and treatment for his HCV for two decades. (Doc. 67 ¶ 6; Doc 67 at 47.) He requested "preventive health care," alleging that that there was no medical reason to deny him this care. (Doc. 67 at 47.) On November 15, 2016, Plaintiff had labs taken, and his APRI score was 0.65. (Doc. 67 ¶ 5; Doc. 67 at 40−41; Doc. 68, Ex. Y (Hutchinson Decl.) ¶ 5(g).)

---

336 F.3d 885, 889 (9th Cir. 2003) (in summary judgment briefing "[g]eneral references without page or line numbers are not sufficiently specific"); *see also Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties.").

On December 13, 2016, Assistant Facility Health Administrator (AFHA) Maureen Johnson responded to Plaintiff's November 8, 2016 grievance as follows:

> Upon review of your medical record I am able to confirm labs were drawn on November 15, 2016 and a chronic care health service encounter is scheduled within the chronic condition monitoring guidelines. Chronic care health service encounters including diagnostics will continue to be completed according to the schedule set by the medical provider within the chronic condition monitoring guidelines. Please be advised, inmates will receive HCV treatment once they meet the following criteria. Patient will be prioritized based on stage of the liver disease (APRI score); patients must meet all of the preliminary criteria like labs and mental health assessment; patients who are determined to be appropriate for treatment will be sent to the Corizon Health HCV Treatment Review Committee to determine overall timing and priority of initiation of treatment, based on relevant clinical criteria. (Doc. 67 at 50.)

On December 15, 2016, Plaintiff saw Christina Boryczka for his scheduled chronic care appointment. He reported having HCV since May 2004, with no prior treatment. (*Id.* at 52.) He stated that he may have acquired the infection from getting street tattoos, but he denied intravenous or intranasal drug use, blood transfusions, or known sexual contacts. (*Id.* at 52.) He denied abdominal pain/swelling, bleeding, bruising, icterus or jaundice, leg swelling, cold intolerance, pruritus, or fatigue, and reported his appetite was good. (*Id.*) Boryczka noted that Plaintiff was "[n]ot a candidate for [HCV] treatment based on most recent APRI score of 0.55," and she ordered new lab tests. (*Id.* at 53−54.) Boryczka told Plaintiff that DAA treatment for his HCV would do more harm than good. (Pl. Decl. ¶ 57.)

On August 4, 2017, Plaintiff had a chronic care telemedicine visit with Dr. James W. Baird. (*Id.* at 56−57.) Plaintiff stated he was diagnosed with HCV in 2004, which he thought he got from using razors in ADC, and he complained of occasional stomach pain and occasional swelling of the lower legs near the ankle. (*Id.* at 56.) Dr. Baird did not physically examine Plaintiff. (Doc. 62 (Pl. Statement of Facts) ¶ 9; Doc. 62, Ex. A (Pl. Decl.) ¶ 1.) Notes from the visit show that per "nursing evaluation," Plaintiff's abdomen

was non-tender, and he had no peripheral edema. (Doc. 67 at 56.) Dr. Baird noted that Plaintiff's HCV was "likely stable," ordered new lab tests, and asked for nursing to schedule Plaintiff for his next chronic care appointment for HCV in 6 months. (*Id.*)

On September 20, 2017, Plaintiff filed this action. (Doc. 1)

On November 7, 2017, Plaintiff was seen in sick call by Dr. Chris Johnson for complaints of frequent urination. (Doc. 62 at 41.) On November 16, 2017, Plaintiff was seen in sick call by Registered Nurse (RN) Barbara Floyd for complaints of a growing rash on the back of his head and a toenail fungus. (*Id.* at 39.) On November 22, 2017, Plaintiff was seen in sick call by Dr. Chris Johnson for complaints of a rash on the back of his head. (*Id.* at 37.)  On December 26, 2017, Plaintiff had labs taken, and his APRI score was 0.62. (Doc. 67 ¶ 10; Doc. 67 at 61; Doc. 68, Ex. Y (Hutchinson Decl.) ¶ 5(h).)

On January 27, 2018, Plaintiff saw NP Michael Brathwaite for his scheduled chronic care appointment, and the objective notes from that visit show Plaintiff's abdomen was soft and nontender with no masses, and he had no edema or sensory deficits. (*Id.* at 67−69.) NP Brathwaite noted that Plaintiff's HCV was "asymptomatic" with an APRI score of 0.62 and ordered labs and follow up in 6 months. (*Id.* at 71.) Plaintiff testifies in his declaration that "NP Brathwaite assured me he would take note of the swelling of my ankles, chills that I have, my back hurting, thoughts being harder to remember, pain and pressure in [my] stomach/liver area." (Doc. 62 ¶ 11; Pl. Decl. ¶ 2.)

On July 5, 2018, Plaintiff had labs taken, and his APRI score was 0.98. (Doc. 67 ¶ 12; Doc. 67 at 76−77; Doc. 68, Ex. Y (Hutchinson Decl.) ¶ 5(i).) On July 14, 2018, Plaintiff saw Dr. Michael Minev for his scheduled chronic care appointment, and Dr. Minev indicated under "subjective notes" that Plaintiff denied chest pain, shortness of breath, dizziness, exercise intolerance, fever, chills, recent illness, abdominal pain, changes in stools, jaundice, weight loss, failure to thrive, ascites, or changes in mentation. (Doc. 67 at 83.) Dr. Minev reviewed Plaintiff's lab results with Plaintiff, noted his APRI score was 0.98, and ordered routine labs for continued monitoring as well as a drug abuse screening, and a fibrotest, which are both initial tests to determine whether Plaintiff is a candidate for

| | |
|---|---|
| 1 | HCV treatment, if it becomes appropriate. (*Id.* at 89; Doc. 48, Ex. Q. (Minev Decl.) ¶ 5.) |
| 2 | Dr. Minev believed, based on Plaintiff's lack of symptoms and APRI score of 0.98 that |
| 3 | Plaintiff was not at risk of serious harm or in substantial pain, and that the most reasonable |
| 4 | and appropriate plan of treatment was to continue routine monitoring of Plaintiff's labs and |
| 5 | symptoms. (Minev Decl ¶¶ 6−9.) Plaintiff testifies that Dr. Minev "assured Plaintiff's |
| 6 | complaints were properly documented, i.e. swelling of ankles, chills, back hurting, |
| 7 | thoughts being harder to remember, pain and pressure in [my] stomach/liver area." |
| 8 | (Doc. 62 ¶ 13; Pl. Decl. ¶ 3.) This was a telemedicine visit, and Dr. Minev did not perform |
| 9 | a physical examination. (*Id.*) |
| 10 |      Plaintiff has never had a liver biopsy or been screened for liver cancer. (Pl. Decl. |
| 11 | ¶¶ 14, 15.) |

**IV.  Discussion**

Defendants argue that they are entitled to summary judgment on the merits and because Plaintiff's claims are time-barred by the applicable statute of limitations. (Doc. 47 at 8−18.)

**A.  Statute of Limitations**

Title 42 U.S.C. § 1983 does not include its own statute of limitations. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (1999). Federal courts apply the statute of limitations governing personal injury claims in the forum state, "along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law." *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014) (citation omitted). In Arizona, the limitations period for personal injury claims is two years. *TwoRivers*, 174 F.3d at 991; *see also* Ariz. Rev. Stat. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues). "If the defendant establishes a *prima facie* case that the statute was applicable, the burden of going forward shifts to the plaintiff to show [his] claims fall within a recognized exception to the statute." *Kiley v. Jennings, Strouss & Salmon*, 927 P.2d 796, 799 (Ariz. Ct. App. 1996).

1    Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991. Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers*, 174 F.3d at 991; *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996). Additionally, the statute of limitations is tolled while a prisoner plaintiff pursues the mandatory exhaustion process. *Soto v. Sweetman*, 882 F.3d 865, 871 (9th Cir. 2018).

Defendants assert that Plaintiff's claims are time-barred because he alleges he that was diagnosed with HCV in 2004 or 2005, and that he has been denied treatment since that time, but did not file his complaint until September 27, 2017. (Doc. 47 at 8.) Defendants appear to maintain that Plaintiff's claims accrued as soon as he became aware that he had HCV, and was required to file this action with two years. But Defendants do not point to any evidence to show when Plaintiff became aware of any injuries he suffered due to his alleged lack of proper HCV treatment. They fail to make a prima facie showing that Plaintiff did not file this action within two years of when his claims accrued—meaning when he first knew or had reason to know of his alleged injuries underlying his claims. *See TwoRivers*, 174 F.3d at 991. Because Defendants fail to make this initial showing, Plaintiff need not show anything, and the Court will deny summary judgment to Defendants on statute of limitations grounds.

### B.     Eighth Amendment Claims

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*

*by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105. And even if deliberate indifference is shown, a prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

### 1. **Individual Capacity Claims**

Plaintiff purports to sue all Defendants in both their individual and official capacities. (Doc. 1 ¶¶ 20−23.) A claim against an individual in his or her official capacity

is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 n.55 (1978). Because Defendants Shroff and the members of the Corizon Treatment Review Committee are Corizon employees, any official capacity claims against them are necessarily duplicative of Plaintiff's claims against Corizon. Thus, the Court will dismiss as duplicative Plaintiff's official capacity claims against these Defendants and address only Plaintiff's individual-capacity claims against them.

A suit against a defendant in his or her individual capacity seeks to impose personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). "A plaintiff must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

### a. Dr. Shroff

Defendants do not dispute that Plaintiff's HCV constitutes a serious medical need. Summary judgment therefore hinges on the second prong of the Eighth Amendment analysis – whether any Defendants were deliberately indifferent to that need. Defendants argue that Plaintiff cannot make this showing as to Dr. Shroff because Dr. Shroff saw Plaintiff only one time, on May 31, 2016, and he was not deliberately indifferent to Plaintiff's HCV. (Doc. 47 at 16.)

The medical record evidence pertaining to Plaintiff's May 31, 2016 chronic care visit with Dr. Shroff shows that Plaintiff presented no symptoms and that Dr. Shroff assessed Plaintiff's HCV as stable, ordered a diagnostic panel prior to Plaintiff's next chronic care visit, and planned to monitor Plaintiff's liver functions and to follow up in 6 months. (Doc. 67 at 32, 36−38.) Plaintiff also testifies in his declaration that Dr. Shroff told him that starting AAD treatment for his HCV would do more harm than good. (Doc. 62 ¶ 57; Doc. 62, Ex. A (Pl. Decl.) ¶ 13.)

These facts do not establish that Dr. Shroff was deliberately indifferent. Dr. Shroff noted that Plaintiff did not have any symptoms at that time and planned to continue

is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 n.55 (1978). Because Defendants Shroff and the members of the Corizon Treatment Review Committee are Corizon employees, any official capacity claims against them are necessarily duplicative of Plaintiff's claims against Corizon. Thus, the Court will dismiss as duplicative Plaintiff's official capacity claims against these Defendants and address only Plaintiff's individual-capacity claims against them.

A suit against a defendant in his or her individual capacity seeks to impose personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). "A plaintiff must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

### a. Dr. Shroff

Defendants do not dispute that Plaintiff's HCV constitutes a serious medical need. Summary judgment therefore hinges on the second prong of the Eighth Amendment analysis – whether any Defendants were deliberately indifferent to that need. Defendants argue that Plaintiff cannot make this showing as to Dr. Shroff because Dr. Shroff saw Plaintiff only one time, on May 31, 2016, and he was not deliberately indifferent to Plaintiff's HCV. (Doc. 47 at 16.)

The medical record evidence pertaining to Plaintiff's May 31, 2016 chronic care visit with Dr. Shroff shows that Plaintiff presented no symptoms and that Dr. Shroff assessed Plaintiff's HCV as stable, ordered a diagnostic panel prior to Plaintiff's next chronic care visit, and planned to monitor Plaintiff's liver functions and to follow up in 6 months. (Doc. 67 at 32, 36−38.) Plaintiff also testifies in his declaration that Dr. Shroff told him that starting AAD treatment for his HCV would do more harm than good. (Doc. 62 ¶ 57; Doc. 62, Ex. A (Pl. Decl.) ¶ 13.)

These facts do not establish that Dr. Shroff was deliberately indifferent. Dr. Shroff noted that Plaintiff did not have any symptoms at that time and planned to continue

is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 n.55 (1978). Because Defendants Shroff and the members of the Corizon Treatment Review Committee are Corizon employees, any official capacity claims against them are necessarily duplicative of Plaintiff's claims against Corizon. Thus, the Court will dismiss as duplicative Plaintiff's official capacity claims against these Defendants and address only Plaintiff's individual-capacity claims against them.

A suit against a defendant in his or her individual capacity seeks to impose personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). "A plaintiff must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

### a. Dr. Shroff

Defendants do not dispute that Plaintiff's HCV constitutes a serious medical need. Summary judgment therefore hinges on the second prong of the Eighth Amendment analysis – whether any Defendants were deliberately indifferent to that need. Defendants argue that Plaintiff cannot make this showing as to Dr. Shroff because Dr. Shroff saw Plaintiff only one time, on May 31, 2016, and he was not deliberately indifferent to Plaintiff's HCV. (Doc. 47 at 16.)

The medical record evidence pertaining to Plaintiff's May 31, 2016 chronic care visit with Dr. Shroff shows that Plaintiff presented no symptoms and that Dr. Shroff assessed Plaintiff's HCV as stable, ordered a diagnostic panel prior to Plaintiff's next chronic care visit, and planned to monitor Plaintiff's liver functions and to follow up in 6 months. (Doc. 67 at 32, 36−38.) Plaintiff also testifies in his declaration that Dr. Shroff told him that starting AAD treatment for his HCV would do more harm than good. (Doc. 62 ¶ 57; Doc. 62, Ex. A (Pl. Decl.) ¶ 13.)

These facts do not establish that Dr. Shroff was deliberately indifferent. Dr. Shroff noted that Plaintiff did not have any symptoms at that time and planned to continue

monitoring Plaintiff's condition through laboratory tests and follow-up chronic care visits, which Dr. Shroff ordered. Plaintiff does not argue or present evidence that he was suffering from any HCV symptoms of which Dr. Shroff was made aware; nor does he dispute Defendants' facts that progression from chronic HCV infection to fibrosis and eventually cirrhosis may take years in some patients, decades in others, or may not occur at all. (*See* Doc. 48 ¶ 16; Doc. 62 ¶ 16.) The evidence also shows that Plaintiff's most recent APRI score was 0.40, putting him in the lowest priority level for HCV treatment absent any other indications that he needed more immediate care. (*See* Doc. 48 ¶ 46; Doc. 67 at 27; Doc. 68, Hutchinson Decl. ¶ 5(f).)

On these facts, Dr. Shroff's decision to continue monitoring Plaintiff and his expressed opinion that starting Plaintiff on antiviral drugs would do more harm than good was not deliberately indifferent. The Court will grant Defendants' Motion for Summary Judgement as to Dr. Shroff.

### b. Other Defendants

Plaintiff's claims against all other Defendants in their individual capacities fail as a matter of law for lack of personal involvement in Plaintiff's HCV care. Defendants argue that there is no evidence Ryan was ever subjectively aware of and showed deliberate indifference to Plaintiff's HCV. (Doc. 47 ¶ 16.) Plaintiff does not dispute this argument, nor does he point to any evidence that would create a genuine issue of material fact that Ryan − or any member of the Corizon HCV Treatment Review Committee − was personally involved in his medical care or was otherwise made subjectively aware of his HCV and showed deliberate indifference to his serious medical needs. To the extent Plaintiff seeks to sue Ryan and members of the Corizon HCV Treatment Review Committee in their individual capacities, these claims fail as a matter of law. The Court will grant summary judgment to these Defendants on these claims.

### 2. *Monell* Liability Claims

To prevail on a claim against Ryan in his official capacity or against Corizon as a private entity serving a traditional public function, Plaintiff must meet the test articulated

in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Ryan or Corizon had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is unwritten, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

Defendants argue that Plaintiff cannot show that Ryan's/Corizon's HCV treatment policies deprived him of his right to receive proper medical care or that any policy, custom, or practice of these Defendants was the "moving force" behind a constitutional violation. (Doc. 47 at 17.) In support, they argue in summary fashion that Corizon follows the BOP guidelines for HCV treatment, and they claim, without specific support, that these treatment policies "are supported by third party medical research." (*Id.*)

Defendants have minimally met their burden of showing that Ryan's/Corizon's HCV treatment policies are not deliberately indifferent. As noted, Plaintiff does not dispute the facts from the BOP Manual that most complications from HCV infection occur in people who develop cirrhosis, and that progression from chronic HCV infection to fibrosis and eventually cirrhosis may take years in some patients, decades in others, or may not occur at all. Under these facts, continued monitoring and the use of APRI scores and physical symptoms to assess whether a prisoner needs treatment is reasonable.

It is also undisputed that, under Ryan's/Corizon's policies, Plaintiff received regular chronic care appointments and lab tests to assess whether his APRI scores or physical symptoms indicated a need for treatment. Plaintiff's medical records show that between

May 2015 and July 2018 Plaintiff's APRI scores fluctuated between 0.40 and 0.98, placing him at the lowest priority for treatment, and that his medical providers consistently found that his HCV was "stable" and "asymptomatic." (*See* Doc. 67 ¶¶ 2, 3, 4, 5, 8, 9, 10, 11, 12.) Dr. Minev, who assessed Plaintiff's symptoms and APRI scores on July 14, 2018, also opined that, based on Plaintiff's APRI of 0.98 and lack of symptoms, "the reasonable and appropriate plan of treatment was to continue routine surveillance of Plaintiff's labs and symptoms." (Minev Decl. ¶6.) These facts and medical opinion evidence additionally support Defendants' initial showing that Ryan's/Corizon's HCV policies and practices of continued monitoring in lieu of immediate treatment with antiviral drugs were not deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff fails to point to evidence that would create a genuine issue of material fact that these policies and practices were deliberately indifferent. He argues generally that there is "clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs," and he claims that Ryan's/Corizon's policies of not providing these drugs to all HCV prisoners is "in contravention of the prevailing standard of care." (Doc. 57 at 16.) But Plaintiff relies solely on his own lengthy summaries of recent HCV treatment developments for which he fails to set forth discrete facts or cite to specific evidence in support of his sweeping claims. (*Id.*) Absent more direct evidence to controvert Defendants' facts, a reasonable jury could not conclude from Plaintiff's general assertions about what constitutes proper HCV care that Ryan's/Corizon's HCV treatment policies deprived Plaintiff of appropriate HCV treatment and were deliberately indifferent to his serious medical needs.

In the alternative, even if Plaintiff could point to specific evidence to create a genuine issue of material fact that Ryan's/Corizon's HCV treatment policies were deliberately indifferent, Defendants argue that Plaintiff fails to show he suffered any injury or that these policies were the "moving force" behind that injury. (Doc. 47 at 17.) They rely on the records from Plaintiff's chronic care visits to argue that there is "no objective

data indicating Plaintiff has suffered a decline in health or interference with daily activities" due to a lack of HCV treatment. (Doc. 47 at 17−18.)

The medical records from Plaintiff's chronic care visits largely support that Plaintiff did not suffer any HCV-related injuries from March, 11, 2015, when Dr. Bertram noted he reported "no symptoms" and had "no evidence of liver disease" (Doc. 67 at 10, 13), through September 20, 2017, when Plaintiff filed this action. Only the medical notes from Plaintiff's August 4, 2017 chronic care visit with Dr. Baird show that Plaintiff complained of occasional stomach pain and swelling of lower legs, but per the nursing evaluation at that time, Plaintiff's abdomen was non-tender and he had no peripheral edema, and Dr. Baird assessed his HCV as "likely stable." (*Id.* at 56−57.)

Thereafter, there is no evidence Plaintiff sought care for his reported stomach pain and/or leg swelling or made any additional complaints about these issues until his next chronic care visits with NP Braithwaite on January 27, 2018 and Dr. Minev on July 14, 2018, both of which occurred after Plaintiff filed his Complaint. The medical records from these visits do not themselves document that Plaintiff had any symptoms or raised any such complaints. They show, instead, that on January 27, 2018, NP Braithwaite noted that Plaintiff's abdomen was soft and nontender with no masses and Plaintiff had no edema or sensory deficits. (Doc. 67 at 67−69.) On July 14, 2018, Dr. Minev noted that Plaintiff denied chest pain, shortness of breath, dizziness, exercise intolerance, fever, chills, recent illness, abdominal pain, changes in stools, jaundice, weight loss, failure to thrive, ascites, or changes in mentation. (*Id.* at 83.) Plaintiff provides declaration evidence, however, that he complained to both NP Braithwaite and Dr. Minev of swelling in his ankles, chills, back pain, thoughts being harder to remember, and pain and pressure in his stomach/liver area, and they each assured him they would document these issues. (Pl. Decl. ¶¶ 2−3.)

Taking Plaintiff's testimony as true, as the Court must, these facts demonstrate that Plaintiff complained to two separate chronic care providers of various symptoms, including pain and pressure in the liver area, which he believed were caused by his HCV, and both providers failed to address his complaints or include them in their medical notes and

treatment recommendations. Apart from being outside the relevant time of the Complaint, however, these two incidents − while concerning − are insufficient to create a genuine issue of material fact that Ryan/Corizon had either a written policy of ignoring prisoners' possible HCV symptoms or that Corizon medical providers had an unwritten practice of doing so that was "so persistent and widespread" as to constitute a "permanent and well settled" practice. *Monell*, 436 U.S. at 691.

In addition to these two chronic care visits, Plaintiff declares more generally that he complained to Corizon personnel "verbationly [sic] and through the Inmate Grievance Procedure" of having "chills, pain and pressure in [his] stomach/liver area at times, thoughts becoming more and more harder to remember, swelling of body parts, and other ailments." (*Id.* ¶ 11.) But absent any facts or supporting evidence showing when and to whom Plaintiff made these complaints and what responses he received, this general assertion also does not create a genuine issue of material fact that any policy or regular practice attributable to Ryan/Corizon caused Plaintiff harm or was "the moving force" behind his alleged injuries. Plaintiff's policy-based claims against Defendants Ryan and Corizon therefore fail as a matter of law, and the Court will grant summary judgment to these Defendants on these claims.

### C. ADA and RA Claims

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" is "any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. . . ." 42 U.S.C. § 12131. Individuals, however, may be sued under the ADA only in their official, rather than their individual, capacities. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (plaintiff cannot sue state officials in their individual capacities to vindicate rights created by Title II of the ADA).

To prevail on an ADA claim, a plaintiff must show that he: "(1) is a handicapped person; (2) that he is otherwise qualified; and that [prison officials'] actions either (3) excluded his participation in or denied him the benefits of a service, program, or activity; or (4) otherwise subjected him to discrimination on the basis of his physical handicap." *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996). The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

"The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance[.]" *Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001) (internal quotations omitted). Title II of the ADA was expressly modeled after § 504 of the RA. *Zuckle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act").

Defendants argue that they are entitled to summary judgment on Plaintiff's ADA claim because Plaintiff cannot show that he has a disability within the meaning of the ADA, or, even if his HCV qualifies as a disability, he cannot show that he has been denied participation in any program, activity, or benefit because of his disability. (Doc. 47 at 10−11.) They further argue that they are entitled to summary judgment on Plaintiff's RA claim because the RA applies only to programs that receive federal funding, and Plaintiff cannot show that that ADC or ASPC-Eyman, where Plaintiff is housed, receive federal assistance. (*Id.*)

Plaintiff argues in his Response that his HCV qualifies as a disability under the ADA because it is an impairment that limits one or more major life activities. (Doc. 57 at 10−12.) He also argues that he is being denied medical services equal to those with other disabilities and is therefore being discriminated against on the basis of his HCV. (*Id.* at 12−13.)

The Court need not determine whether or under what circumstances Plaintiff's HCV may be regarded as a disability under the ADA because Plaintiff cannot show that he has been excluded from participation in or denied the benefits of a service, program, or activity for which he would otherwise qualify, or that he has been subjected to discrimination, because of his HCV. As Defendants point out, any such argument is circular because Plaintiff is essentially arguing that he is being denied HCV treatment, for which he would otherwise qualify, *because* he has HCV. (Doc. 47 at 11, 12−13.) In fact, the evidence shows that Plaintiff is being treated for his HCV through regular chronic care visits and monitoring of his APRI scores. He is not being denied medical treatment because he has HCV. To the extent Plaintiff argues he is being denied proper treatment with antiviral medications, this also is not a proper basis for an ADA or RA claim. The evidence shows that Plaintiff has not been approved for antiviral treatment because he does not meet the standards to be prioritized for such treatment under Ryan's/Corizon's HCV treatment policies, not because he has HCV. Absent this necessary showing, Plaintiff's ADA and RA claims fail as a matter of law, and the Court will grant summary judgment to Defendants on these claims.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 47).

(2) Defendants' Motion for Summary Judgment (Doc. 47) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 13th day of August, 2019.

_____
David G. Campbell
Senior United States District Judge